# United States Court of Appeals
## For the First Circuit

No. 06-1029

NEIGHBORHOOD ASSOCIATION OF THE BACK BAY, INC.;
THE BOSTON PRESERVATION ALLIANCE, INC.,

Plaintiffs, Appellants,

v.

FEDERAL TRANSIT ADMINISTRATION;
MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Joseph L. Tauro, U.S. District Judge]

---

Before

Boudin, Chief Judge,
Torruella and Dyk* Circuit Judges.

---

Laurence E. Hardoon, with whom Deirdre Brennan Regan and
Brody, Hardoon, Perkins & Kersten, LLP, were on brief, for
appellants Neighborhood Association of the Back Bay, Inc., The
Boston Preservation Alliance, Inc.
Barbara Healy Smith, with whom Michael J. Sullivan was on
brief, for appellee Federal Transit Administration.
Stephen M. Leonard, with whom Rachel A. Lipton and Brown
Rudnick Berlack Israels L.L.P., were on brief, for appellee
Massachusetts Bay Transportation Authority.

---

September 14, 2006

---

*Of the Federal Circuit, sitting by designation.

**DYK, Circuit Judge.** The Neighborhood Association of the Back Bay, Inc. ("NABB") and the Boston Preservation Alliance ("BPA") (collectively "Plaintiffs") brought suit against the Federal Transit Authority ("FTA") and Massachusetts Bay Transit Authority ("MBTA"), asserting that planned modifications to the Copley Square transit station violated historical preservation statutes. The United States District Court for the District of Massachusetts denied preliminary and final injunctive relief. Because we conclude that the plaintiffs have not established a violation of applicable federal or state statutes, we affirm.

BACKGROUND

This case primarily presents questions as to whether the FTA, in providing funding to the MBTA to make the Copley Square station compliant with the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (2000), has violated various federal statutes designed to preserve historic properties.

I.

Under Title II of the ADA, 42 U.S.C. §§ 12131-12165 (2000), and its implementing regulations, 49 C.F.R. §§ 37.47-51, public transit authorities receiving federal funds are required to identify "key stations" in their transit stations and then make those stations accessible to wheelchair users. 42 U.S.C. § 12147.

In 1992 the Copley Square station was identified by the MBTA as a key station, and plans were made to modify the station to make it wheelchair accessible. To make the station wheelchair

accessible would require installation of new inbound and outbound elevators to transport wheelchair users.

Under 49 U.S.C. § 5310, the FTA provides federal funds to state entities such as the MBTA to assist them in achieving compliance with the ADA. However, in providing funding, the FTA, like other federal agencies, must ensure that the funded projects comply with various federal statutes dealing with historic preservation, including two sections of the National Historic Preservation Act ("NHPA") -- 16 U.S.C. § 470f ("section 106"), and 16 U.S.C. § 470h-2(f) ("section 110(f)"). The FTA must also comply with Section 4(f) of the Department of Transportation Act of 1966 ("DOTA"), 49 U.S.C. § 303 ("section 4(f)").

The problem with the planned modifications to the Copley Square station lies in the fact that the station is adjacent to the Boston Public Library ("the Library") and the Old South Church ("the Church"), both of which are designated as National Landmarks and are listed on the National Register of Historic Places. The Library and Church are located within the Back Bay Historic District, which is itself on the National Register of Historic Places, as is the existing inbound entrance headhouse to Copley station. The proposed modifications to the station would require use of part of the Library steps for the inbound elevator and construction of an outbound elevator adjacent to the Church. The plaintiffs contend that the proposed modifications would violate

sections 106, 110 and section 4(f). Understanding plaintiffs' contentions requires a description of these statutes, and the process by which the FTA sought to achieve compliance with their requirements.

Section 106 of the NHPA requires federal agencies, "prior to the approval of the expenditure of any Federal funds on the undertaking" to "take into account the effect" a federal undertaking will have on "any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" and to "afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking." The regulations under this section make clear that section 106 is applicable only when the proposed action would have an "adverse effect" on an historic property such as the Library and the Church. 36 C.F.R. § 800.5.

Section 110(f) of NHPA provides that "[p]rior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark" the agency "shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking." A precondition to the application of section 110(f) is an action that "may directly and adversely affect" a Landmark property, such as the Church or

-4-

Library.

Section 4(f) provides that the Secretary of Transportation may approve a transportation project "requiring the use of . . . land of an historic site . . . only if: (1) there is no prudent and feasible alternative to using that land; and (2) the . . . project includes all possible planning to minimize harm to the . . . historic site . . . ." 49 U.S.C. § 303(c) ("Section 4(f)"). The provision applies only if there is a "use" of an historic site.

To comply with these statutes, the FTA must find that the state entity complies with each statute before disbursing federal funds for any transportation project, including an ADA accessibility project. But the FTA need not undertake separate reviews under each statute. 36 C.F.R. § 800.3(b). Furthermore, in determining compliance with these statutes a federal agency such as the FTA can rely on state agencies such as the MBTA, and on consultants. 36 C.F.R. § 800.2(a)(3). Here, the FTA, in concluding that the Copley Station project complied with all these statutes, relied on "information, analyses and recommendations" prepared by the MBTA. The MBTA, in turn, relied on consultants.

II.

The MBTA initially addressed the requirements of the ADA in 1995. The MBTA commissioned a consultant to perform a study, the "Schematic Design Report" (the "1995 Report"), that explored

options for making these key stations accessible. The 1995 Report identified several options for locating elevators at the Copley Square station, and listed advantages and disadvantages of each. It identified four options for locating the outbound elevator: option A located the elevator in front of the Church, and options B, C, and D located it across the street from the Church. The report noted that option A "has the most serious historic adjacency issues" with respect to the Church, but that it created "[n]o major impacts on streetscape elements and infrastructure," required little construction work, and was "[l]ocate[d] along the main path of access."

The report identified two potential locations for the inbound elevator: option E located the elevator adjacent to the existing historic wrought iron subway entrance on the Library steps, and option F located it about 150 feet away from the existing entrance without using the Library steps. Option E called for the construction of a matching structure on the other side of the existing entrance. The 1995 Report concluded that failure to build this matching structure would "seriously compromise the explicit symmetry of the [historic landmark] composition." It also stated that option E "is problematic because it not only creates the very difficult task of imposing new structures along side the intricately detailed wrought iron headhouse, but also creates many interface problems with the Boston Public Library." As for option

F, the report noted that it had a lesser "streetscape and urban impact" than option E, "but place[d] the entrance in a remote location from the main entry to the station," which raised questions of ADA compliance and also posed a number of engineering difficulties.

At some point before May 28, 2002, the MBTA settled on option E (library steps), minus the matching structure, for the inbound elevator, and option A for the outbound elevator, locating the elevator in front of the Church. The matching structure for the inbound elevator was rejected because it would have been positioned above the Library's basement, making it impractical to anchor. Meetings were held with representatives of the Library and the Church; no objection was raised to the locations of the elevators. However, on August 22, 2003, plaintiff NABB by letter requested various changes to the project, including the locations for both inbound and outbound elevators. The letter requested that the inbound elevator be placed 150 feet away from the existing Library entrance (option F), rather than on the Library steps, and that the outbound elevator be placed across the street from the Church rather than directly in front of it. NABB did not then assert that the placement of the elevators violated federal statutory requirements.

The MBTA first addressed the requirements of the various federal historical preservation statutes when it requested that its

preservation consultant prepare a report (the "Carolan Report"). Though entitled "Section 106 and 4(f) Review," the Carolan Report only discussed section 106 and did not mention section 4(f) at all. Nor did the report address the requirements of section 110(f). The report described the project, including the planned elevator locations, and explained the effects of the project. The report concluded that "the primary effect of [the project] would be a visual one," and that the selected designs "will not interfere with existing historic architectural structures." The report did not discuss the alternative locations, but concluded that the planned locations and designs for the inbound and outbound elevators would not have an "adverse effect" within the meaning of section 106.

On August 29, 2003, based on the Carolan Report, the MBTA sent a letter to the FTA stating that "[i]n view of these facts, it is our opinion that the project will have 'No Adverse Effect' on any historic resources." The MBTA "request[ed] a determination of No Adverse Effect by FTA."

As the regulations require,[1] the FTA by letter formally advised the Massachusetts Historic Commission ("MHC") of the Copley Station improvement on January 23, 2004, and requested "[the MHC's]

---

[1]     The regulations promulgated under section 106 provide that "[i]f the agency official proposes a finding of no adverse effect, the agency official shall notify all consulting parties [here including the MHC] . . . [and] the [MHC] shall have 30 days from receipt to review the finding." 36 C.F.R. § 800.5(c). If the MHC disagrees, further consultation is required. Id. at § 800(c)(2).

concurrence in [the FTA's] determination that this project will have no adverse effect on historic resources." The parties appear to agree that this letter constitutes the FTA's finding of "no adverse effect" under section 106. The MHC concurred in the FTA's finding of "no adverse effect" on January 29, 2004.

As required by section 4(f) regulations, in a February 5, 2004, letter to the Department of the Interior ("DOI"), the FTA addressed the requirements of section 4(f); found that the project complied with section 4(f); and requested the DOI's concurrence in that finding. The FTA found that "[b]ased on our review of the attached documentation [including the Carolan Report, renderings and schematics] as well as consultation with the Massachusetts State Historic Preservation Officer (concurrence attached) we have determined that [in the language of section 4(f)] there is no prudent and feasible alternative to the proposed project and that all possible measures to minimize harm have been included in the project planning." The DOI concurred on May 10, 2004.

In connection with an environmental assessment required by the National Environmental Policy Act ("NEPA"),[2] the FTA on

---

[2] NEPA requires federal agencies to consider the environmental impacts of agency decisions. 42 U.S.C. §§ 4321-4370(e); 40 C.F.R. § 1500-1518 (2004). Federal agencies are required to prepare an Environmental Impact Statement ("EIS") for any action that could significantly affect the quality of the human environment. 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.27. Agencies file an Environmental Assessment ("EA") in order to determine whether an EIS is required. 40 C.F.R. § 1501.4. If on the basis of the EA the agency determines an EIS is not required, the agency

December 30, 2004, issued a "Finding of No Significant Impact" ("FONSI") as required by NEPA. As part of this document the FTA further explained its conclusions with regard to 4(f). The FTA acknowledged that "[a]n element of the proposed project [the inbound elevator] . . . will use land from the [Library]," and that the alternative of placing the elevator 150 feet away had not been presented in the [MBTA's] earlier 4(f) evaluation [the Carolan Report]. However, the report concluded that this alternative was not "prudent and feasible" within the meaning of section 4(f) because it would not coincide with the circulation path of the public to the maximum extent practicable, as required by the ADA.[3] The alternatives for the outbound elevator were rejected for engineering and passenger-flow reasons.

---

publishes a "Finding of No Significant Impact," or "FONSI." 40 C.F.R. § 1501.4(e). Here, the FTA prepared an EA and a FONSI. The FONSI found that "the proposed project will have no significant adverse impacts on the environment," and thus that an EIS was not required.

[3] In particular, the EA stated that option F (placing the inbound elevator 150 feet away from the existing entrance) was not "appropriate or feasible" because it created a segregated entrance for handicapped individuals, and would require the construction of a tunnel linking the passengers to the fare collection area, or the implementation of a "caged gate" system, which would require an MBTA station operator to periodically release batches of individuals from a caged area at the base of the elevator. The EA noted that eliminating the matching headhouse from option E increased the impact of the headhouse, but explained that retaining the headhouse was "infeasible from an engineering perspective."

III.

Plaintiffs NABB and BPA filed suit under the APA on June 9, 2005, alleging that the FTA and MBTA violated sections 106 and 110(f) of NHPA, and section 4(f) of DOTA in approving the project. The plaintiffs also alleged that the MBTA had violated Massachusetts General Laws Chapter 161A, Section 5(k), which required the MBTA to afford parties a "timely opportunity" to participate in the development of "major transportation projects."

Following a hearing, the district court denied plaintiffs' request for injunctive relief on November 8, 2005. On November 23, 2005, plaintiffs timely appealed. On December 28, 2005, the district court issued a Memorandum and Order setting forth its reasoning.

While the district court primarily treated the plaintiffs' request as if it were a motion for a preliminary injunction and thus examined likelihood of success, risk of irreparable harm, the balance of the hardships and the public interest, the district court's Order and Memorandum also denied the permanent injunction.

Addressing the likelihood of success, the district court rejected the plaintiffs' argument that the FTA violated the procedural requirements of the section 106 regulations by failing adequately to document its "no adverse effect" finding, by failing to independently review the project, or by failing to consult with

the requisite "consulting parties" in reaching the conclusion that there would be no adverse effect. The district court also concluded that plaintiffs had not established that the no adverse effect finding was arbitrary and capricious.

Next, the district court rejected plaintiffs' argument that section 110(f) was violated. The court held that section 110(f), which is triggered when an undertaking "may directly and adversely affect" a National Historic Landmark, does not apply when an agency properly determines a project has no adverse effect.

The court then rejected plaintiffs' contention that section 4(f) was violated. The court first addressed the proposed inbound elevator, and held that although the inbound elevator would "use" a historic landmark, the plaintiffs had failed to establish "prudent and feasible" alternatives to that use because the proposed alternatives failed to achieve the project's purpose of complying with ADA requirements. As for the outbound elevator, the district court sustained the agency's conclusion that the planned construction would not directly or constructively "use" a historic landmark, and thus section 4(f) did not apply.

Finally, the court addressed the plaintiffs' state law claim, and held that the MBTA had not violated section 5(k) because the MBTA had afforded the plaintiffs a timely opportunity to participate in the design process.

Proceeding with the remaining "preliminary injunction" factors, the district court found that there was no risk of irreparable harm because the project would have no adverse effect on the properties; that the public interest would best be served by making the stations ADA accessible as soon as possible; and that the balance of hardships favored the MBTA and the public because further delays would be expensive and could disrupt the MBTA's ADA accessibility plans.

We have jurisdiction pursuant to 28 U.S.C. § 1291.

DISCUSSION

Judicial review here is governed by the Administrative Procedure Act, 5 U.S.C. § 706, which requires that agency action be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action failed to meet statutory, procedural, or constitutional requirements.

Precision of expression is not the hallmark of either the historic preservation statutes involved here or the regulations promulgated to implement those statutes. In view of this ambiguity, we defer, where appropriate, to the various agency views as to the applicable requirements. Under the Chevron doctrine, an agency's interpretation of a statute is entitled to weight when the statute is silent or ambiguous. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43

(1984). We also owe deference to an agency's interpretation of its own regulations. See United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 219 (2001).

Here, we owe Chevron deference to the statutory interpretations reflected in the regulations promulgated by the Advisory Council on Historic Preservation ("ACHP") under sections 106 and 110, and promulgated by DOTA under section 4f. We also owe deference to the decision of the FTA interpreting the DOTA regulations, because the FTA is an agency within the DOT. See Cleveland Indians, 532 U.S. at 219. We do not owe deference to the FTA's interpretation of regulations promulgated by other agencies, such as the section 106 and 110(f) regulations. Nonetheless, we owe deference to the FTA's no adverse effect finding under sections 106 and 110, since the FTA has jurisdiction to make the finding, even though it does not have interpretive authority. See Adams Fruit Co., Inc. v. Barrett, 494 U.S. 638, 650 (U.S. 1990) (recognizing that "agency determinations within the scope of delegated authority are entitled to deference" even where the agency does not have interpretive authority and thus is not entitled to Chevron deference); see also Conservation Law Foundation v. Federal Highway Admin., 24 F.3d 1465, 1476-77 (1st Cir. 1994) (holding that administrative decisions under section 4(f) are subject to a highly deferential standard of review).

Underlying deference to agency action are assumptions that the agencies are better able to articulate the pertinent policies, and to reconcile the policies of potentially conflicting statutes. An equally important assumption is that the agencies will, in fact, carefully consider the policy issues and articulate their resolution with clarity. Here the goals of the historic preservation statutes potentially conflict with the mandates of the ADA. As we will see, the FTA, while adequately performing its assigned task, has fallen short of distinction in doing so, giving little more than the bare minimum attention to historic preservation issues. Of even greater concern, the agencies (ACHP, DOTA, ATBCB) charged with promulgating regulations interpreting the historic preservation statutes and reconciling them with the ADA have issued regulations that are in some respects cryptic and confusing. While we have been able to construe those regulations in the present case so as to resolve the matter at hand, the deficiencies in the existing regulations likely invite further litigation as to future projects.

I.  Compliance with Section 106 of NHPA

The National Historic Preservation Act of 1966, 16 U.S.C. § 470 et seq., "requires each federal agency to take responsibility for the impact that its activities may have upon historic resources, and establishes the Advisory Council on Historic

Preservation ["ACHP"] . . . to administer the Act." <u>City of Grapevine</u> v. <u>Dep't of Transp.</u>, 17 F.3d 1502, 1508 (D.C. Cir. 1994).

Section 106 of the NHPA requires that the FTA or any other federal agency, in funding a project,

> take into account the effect of the undertaking [project] on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under part B of this subchapter a reasonable opportunity to comment with regard to such undertaking.

The Library and Church are included in the National Register. Under such circumstances, the ACHP regulations require the FTA to determine whether the project will have an "adverse effect" on the historic properties. 36 C.F.R. § 800.5. If the agency finds an adverse effect, then the agency must follow procedures under section 800.6 designed to avoid or mitigate the adverse effects. 36 C.F.R. §§ 800.5(d)(2); 800.6(a),(b); 800.7 ("failure to resolve adverse effects"). <u>See</u> 36 C.F.R. § 800.8 (coordination with NEPA, including early 106 review).

Section 106 is a procedural statute that requires agency decisionmakers to "stop, look, and listen," but not to reach particular outcomes. <u>Narragansett Indian Tribe</u> v. <u>Warwick Sewer Authority</u>, 334 F.3d 161, 166 (1st Cir. 2003).

Plaintiffs argue that for various reasons the requirements of section 106 were not met. Plaintiffs first contend that the FTA committed procedural error during the process leading

up to the "no adverse effect" finding.  Plaintiffs complain that the FTA did not conduct an independent analysis of historical impacts of the undertaking and instead improperly relied on the determination of the Carolan Report and the MBTA.  However, the regulations expressly permit an agency to "use the services of applicants, consultants, or designees to prepare information, analysis and recommendations," 36 C.F.R. § 800.2(a)(3); see also Narragansett Indian Tribe, 334 F.3d at 168 ("The regulations themselves explicitly contemplate the use of consultants to provide analyses for use in the § 106 process.").

Although the plaintiffs urge that there is no indication that the FTA made the required independent determination, there is no specific requirement in the statute, the regulations or the APA that the FTA provide detailed explanations for its decision or use any particular form of words signifying that it made an independent determination.[4]  Moreover, we are required to presume that the FTA abided by the statutory requirements in the absence of any showing that it did not do so.  Bowen v. Am. Hosp. Assn., 476 U.S. 610, 626-27 (1986); Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 n.9 (1983).  As the district court found

---

[4]    See Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 655-56 (1990) (holding that the APA does not specifically require the agency to explain its decision when an informal adjudication is involved); Camp v. Pitts, 411 U.S. 138, 142 n. 3 (1973) (holding that the APA's requirement of a written explanation on the record applies only to adjudications required to be made on the record or to formal rulemaking).

here, "[p]laintiffs offer no credible evidence indicating that the FTA did not conduct an independent review, or that it 'rubber stamped' the MBTA's conclusion of 'no adverse effects.'"

We also see no merit in plaintiffs' contention that the documentation provided to the MHC by the FTA did not adequately explain the basis of the no adverse effect finding. They rely on regulations that require that the documentation "enable" reviewing parties "to understand [the] basis" of the adverse effect finding as required by the regulations. 36 C.F.R. § 800.11(a); see also 36 C.F.R. § 800.11(e) (requiring documentation to support an adverse effect finding). The plaintiffs' primary contention is that the underlying documentation did not address alternative locations for the elevators, but there is nothing in the statute or regulations that requires the consideration of alternatives in making the no adverse effect determination. Plaintiffs' fallback position is that the document did not consider elevator location at all in reaching the no adverse effects finding. This is not correct. The documents, including the Carolan Report, described in detail the basis for the finding and considered the location of the elevators in making the finding.[5]

---

[5]     Plaintiffs' argument that they should have been deemed consulting parties because they were interested in the project and that interest was well-known is also without merit. The regulations expressly require parties to make a written request to become consulting parties, and gives the agency and SHPO (here the MHC) the discretion to decide whether to grant the request. 36 C.F.R. § 800.3(c)(5).

-18-

Turning to the merits, the plaintiffs also contend that the no adverse effect finding is not sustainable. Again, we disagree.

Plaintiffs argue that the regulations promulgated under section 106 compel a finding of "adverse effect." Their principal contention is that locating the inbound elevator on the Library steps will have an adverse effect on the Library.

The section 106 regulations, 36 C.F.R. § 800.5 ("Assessment of adverse effects"), set forth the criteria for determining whether an action will have an adverse effect. Section 800.5(a) provides that the "agency official shall apply the criteria of adverse effect to historic properties within the area of potential adverse effects." Section 800.5(a)(1) ("Criteria of adverse effect") provides:

> An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling or association. . . . (emphasis added).

The FTA relied on various documents to support its no adverse effect finding, including its implicit conclusion that the integrity of the Library was not compromised. The plaintiffs argue that the 1995 Report would only support a finding of no diminishment if the original option E had been adopted (using matching headhouses on either side of the library) and that the

-19-

report did not support such a finding with respect to the final plan that eliminated the matching headhouse.  Plaintiffs correctly point out that the 1995 Report concluded that the elimination of the matching headhouse would "<u>seriously compromise the explicit symmetry of the composition</u>." (Emphasis added)[6]  However, the 1995 Report was not addressed to federal statutory requirements, and the FTA primarily relied on the later Carolan report, which was prepared after the elimination of the matching headhouse, for this purpose.  The Carolan Report described the historic setting of Copley Station at length, and concluded that the selected designs "will not interfere with existing historic architectural structures."  This report amply supports the agency's conclusion that the inbound elevator would not have an adverse effect, <u>i.e.</u>, that it would not "diminish the integrity" of the historical sites or "change the character" of features of the Library that contribute to its historical significance.  The plaintiffs have failed to show that this finding, on which the FTA relied, was arbitrary or capricious.

Plaintiffs also urge that, even if the FTA was not arbitrary and capricious in concluding that the proposed location

---

[6]    Plaintiffs also point to various inaccurate statements in the 1995 Report.  For example, the Report erroneously states that "the exi[s]ting steps will not be disturbed," and that "option F locat[ed] the elevator in front of the Old Library."  Plaintiffs have not established that the FTA relied on these erroneous statements (which are contradicted elsewhere in the 1995 Report) in making its no adverse effect finding.

of the inbound elevator would not "diminish the integrity" of the library, section 800.5(a)(2), which lists specific examples of adverse effects, compels an adverse effect finding. This section provides that:

> [a]dverse effects on historic properties include, but are not limited to:
>
> (i) Physical destruction of or damage to all or part of the property;
> (ii) Alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous material remediation, and provision of handicapped access, that is not consistent with the Secretary's standards for the treatment of historic properties (36 CFR part 68) and applicable guidelines . . . .

Plaintiffs argue that locating the inbound elevator on the Library steps has an adverse effect on the Library because disturbing the Library steps constitutes "[p]hysical destruction of or damage to all or part of the property" under subpart (i).

This interpretation is inconsistent with the structure of the regulations. Under subpart (ii) adverse effects include "[a]lteration of a property, including . . . provision of handicapped access . . . that is not consistent with the Secretary [of the Interior's] standards for the treatment of historic properties (36 C.F.R. part 68) and applicable guidelines." 800.5(a)(2)(ii) (emphasis added). Thus, subpart (ii) effectively recognizes that alterations consistent with the Secretary's regulations will not create an adverse effect if they are designed to secure handicapped access. In this respect the regulations are

-21-

evidently designed to avoid potential conflicts with the requirements of the ADA. If subpart (ii) is to be given its full effect, subpart (i) cannot compel an adverse effect finding when a property is physically altered to secure handicapped access in a manner that could be said to "damage" the property. Rather, subpart (i) must be read to refer only to "damage" that does not come within the purposes enumerated in subpart (ii). In other words, alterations for the provision of handicapped access are governed exclusively by subpart (ii).

We similarly reject the plaintiffs' contentions that the placement of the inbound elevator could violate subsection (iv) ("[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance") and subsection (v) ("[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features"). Again, if the project complied with subsection (ii), it cannot be argued that it failed to comply with subsections (iv) and (v).

We find no merit in plaintiffs' confusing contention that there was an adverse effect within the meaning of subpart (ii) itself. Plaintiffs have not shown that the alterations to the Library steps are inconsistent with the Secretary of the Interior's standards for the treatment of historic properties set out in 36 C.F.R. part 68.

We finally reject plaintiffs' argument that the placement of the <u>outbound</u> elevator would have an adverse effect on Old South Church; and that placement of both elevators would have an adverse effect on the design of the Back Bay region of the city, which itself appears in the National Register of Historic Places; and that the rehabilitation of the existing wrought iron entrance would constitute an adverse effect under subpart (ii). The FTA's finding of no adverse effect encompassed the project as a whole, including both the inbound and the outbound elevator. The plaintiffs have failed to show that this finding was arbitrary or capricious.

We conclude that the agency's finding of "no adverse effect" must be sustained.

## II. Compliance with Section 110(f)

Plaintiffs next argue that even if the "no adverse effect" finding was proper under section 106, section 110(f) was violated. Section 110 of the NHPA imposes more stringent procedural requirements when National Historic Landmarks are involved, and is involved here because both the Library and the Church are National Historic Landmarks. Section 110(f) provides:

> Prior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.

The implementing regulation for section 110(f), 36 C.F.R. § 800.10, calls for the same procedures as section 106 (<u>i.e.</u>, the procedures specified in 36 C.F.R. §§ 800.6 and 800.7 requiring consultation with the ACHP), but further requires that the agency "invite the Secretary [of the Interior] to participate in the consultation where there may be an adverse effect" and requires that the ACHP "report the outcome of the section 106 process . . . to the Secretary [of the Interior]. . . ." 36 C.F.R. §§ 800.10(c), (d).

Unfortunately, in the course of the lengthy review process, the FTA did not directly address section 110(f). On appeal the FTA and MBTA urge that, nonetheless, the district court's decision may be affirmed because section 110(f), like section 106, is only triggered when there has been an "adverse effect," and that the section 106 "no adverse effect" finding (that we have already sustained) means that section 110(f) is inapplicable.

Plaintiffs disagree. They point out that the heightened planning and consultation requirements of section 110 are triggered when an undertaking "<u>may</u> directly and adversely affect" a historic landmark. Plaintiffs urge that section 110(f) is triggered whenever there is a possible adverse effect, and that a no adverse effect finding is not the same as a finding that there is no possible adverse effect.

-24-

We think the language of section 110(f) is ambiguous and that this ambiguity is not resolved by the legislative history speaking of the "higher standards" for compliance with section 110. That committee report language was not referring to a stricter standard for a section 110 adverse effect finding, but rather to the higher standard imposed once an adverse effect finding has been made. H.R. Rep. No. 1457, 96th Cong., 2d. Sess. 36-38, reprinted in U.S.C.C.A.N. 6378, 6399-6401 ("This section does not supercede Section 106, but complements it by setting a higher standard for agency planning in relationship to landmarks before the agency brings the matter to the Council.").

The ACHP's regulations, to which we owe Chevron deference, require an adverse effect finding as a predicate to section 110(f)'s application. Section 800.10 of the regulations, which implements section 110(f), provides that "[w]hen commenting on [undertakings that may directly and adversely affect a National Landmark], the [ACHP] shall use the process set forth in §§ 800.6 through 800.7." § 800.10(a). This process (set forth in §§ 800.6 through 800.7) repeatedly assumes that an adverse effect is present. Section 800.6 is titled "resolution of adverse effects" and contains no provision for the situation where an adverse effect is absent, while section 800.7 deals with "failure to resolve adverse effects." In fact, during the section 106 review process, section 800.6 ("Resolution of Adverse Effects") and 800.7 ("Failure

-25-

to resolve adverse effects") are triggered only after the agency finds that there is an adverse effect under section 800.5(d)(2). Logically, when the process of sections 800.6 and 800.7 is triggered by section 110(f), an adverse effect must be present because that process yields no result otherwise.

Plaintiffs appear to urge that these regulations unreasonably interpret the statute to require a present effect, but in fact the regulations specifically contemplate situations in which an "adverse effect" finding may be based on future injury. Thus, for example, section 800.5(a)(1) provides that "[a]dverse effects may include reasonably foreseeable effects . . . that may occur later in time . . . ." Therefore, an agency's "adverse effect" finding would also include the situation where there "may" be an adverse effect in the future. Construing section 110(f) to be triggered only upon a finding of adverse effect is therefore perfectly consistent with the use of the word "may" in section 110(f).

Because we conclude section 110(f) is not implicated when there is no adverse effect, and the FTA properly concluded that the project would have no adverse effects, we reject plaintiffs' argument that 110(f) was violated.

### III. Compliance with Section 4(f)

Next, we turn to plaintiffs' claim that the FTA's

approval of the Copley Station improvements violated section 4(f).[7]

Section 4(f), unlike sections 106 and 110(f), imposes a substantive mandate. 49 U.S.C. § 303(c) (2000). It imposes a dual requirement, providing that the Secretary of Transportation may approve a project "requiring the use of land of an historic site only if: (1) there is no prudent and feasible alternative to using that land; and (2) the project includes all possible planning to minimize harm to the . . . historic site resulting from the use." 49 U.S.C. § 303(c). The Supreme Court's decision in <u>Overton Park</u> requires courts reviewing agency action under the APA for compliance with 4(f) to follow the traditional approach to review of administrative action. <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 414 (1971) (citing 5 U.S.C. § 706(2)(A), (B), (C), (D) (1964 ed., Supp. V)).[8]

Plaintiffs argue that the FTA's approval of the inbound and outbound elevator locations for the Copley Station project violates both sections 4(f)(1) and 4(f)(2).

---

[7] A recent amendment to section 4(f), dealing with projects whose "uses" of historic sites have only a de minimis impact on those sites, is not at issue in this case, because the 4(f) process in this case was concluded before the amendment's adoption. <u>See</u> P.L. 109-59 (Aug. 10, 2005).

[8] <u>See also</u> <u>Valley Community Preservation Com'n</u> v. <u>Mineta</u>, 373 F.3d 1078, 1084 (10th Cir. 2004).

A.   The Inbound Elevator

1.   Section 4(f)(1)

Plaintiffs first argue that the placement of the inbound elevator on the steps in front of the Library constitutes a direct "use" of an historic site for which there is a "prudent and feasible" alternative under section 4(f)(1).  Since the defendants agree that the elevator "uses" the historic site, the only issue is whether there is a "prudent and feasible alternative."

In Overton Park, the Supreme Court drew a distinction between feasibility and prudence.  A feasible alternative is one that can be built as a matter of sound engineering.  401 U.S. at 411; see also Druid Hills Civic Ass'n v. Federal Highway Admin., 772 F.2d 700, 715 (11th Cir. 1985).  Here, appellees do not contend that the alternative location, away from the library steps, could not be built.  Rather, they maintain that that alternative is not "prudent."[9]

It is well settled that an alternative is not prudent if it does not meet the transportation needs of a project.[10]  The

_____

[9]    In one respect, there is a feasibility issue.  Plaintiffs maintain that if the inbound elevator were to be placed on the library steps, creating a matching headhouse was a feasible and prudent alternative.  The FTA's determination that the matching headhouse was not "feasible" because of engineering difficulties was not arbitrary and capricious.

[10]    City of Bridgeton v. FAA, 212 F.3d 448, 461 (8th Cir. 2000) (an alternative "that does not effectuate the project's purposes is, by definition, unreasonable, and need not be evaluated in detail under  4(f)"); Citizens against Burlington, Inc. v.

-28-

transportation needs of the project include ADA compliance.  The FTA determined that placing the handicap accessible elevator entrance 150 feet from the main entrance would create a segregated handicap entrance and violate ADA regulations.[11]

The FTA's conclusion in this respect is not arbitrary or capricious.  Guidelines promulgated under the ADA require that "accessible route[s] shall, to the maximum extent feasible, coincide with the route for the general public." 49 C.F.R. pt. 37, app. A 4.3.2(1).  With respect to "Key Stations" (such as Copley) "[t]he circulation path, including an accessible entrance and an accessible route, for persons with disabilities shall, to the maximum extent practicable, coincide with the circulation path for the general public."  49 C.F.R. pt. 37, app. A 10.3.1(1), 10.3.2(2).[12]  These regulations respond to Congress' concern that "historically, society has tended to isolate and segregate

---

Busey, 938 F.2d 190, 203 (D.C. Cir. 1991); Hickory Neighborhood Defense League v. Skinner, 910 F.2d 159, 164 (4th Cir. 1990) (in approving highway project, Secretary may reject as imprudent alternatives that will not solve or reduce existing traffic problems); Druid Hills, 772 F.2d at 715; Arizona Past & Future Found. v. Dole, 722 F.2d 1423, 1428-29 (9th Cir. 1983).

[11]    The FONSI explained that the "FTA did not consider this alternative to be prudent and feasible since it would not coincide with the circulation path of the general public [and thus would not comply with the ADA]."  The attached Environmental Assessment, and the 1995 Report reached the same conclusion.

[12]    They also require that handicap entrances be situated to "minimize the distance which wheelchair users and other persons who cannot negotiate steps may have to travel compared to the general public." 49 C.F.R. pt. 37, app. A, 10.3.1(1).

-29-

individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2) (2000).

While plaintiffs correctly point out that the regulations thus only require that the path coincide with that of the general public to the extent that this is "feasible" and "practicable,"[13] we read those qualifications as directed only to engineering and cost considerations and not to concerns of historic preservation. Cf. Overton Park, 401 U.S. at 411. Rather, the ADA deals elsewhere with historic preservation issues, directing the Architectural and Transportation Barriers Compliance Board ("ATBCB") to issue supplementary guidelines that include "procedures and requirements for alterations that will threaten or destroy the historic significance of qualified historic buildings and facilities as defined in 4.1.7(1)(a) of the Uniform Federal Accessibility Standards ["UFAS"]." 49 C.F.R. pt. 37, app. A, § 4.1.7. The ATBCB has adopted such guidelines, See 36 C.F.R. part 1191, app. B § 202.5. The DOT has adopted similar guidelines in the UFAS, section

_____

[13] 49 C.F.R. pt. 37, app. A 4.3.2(1) ("accessible route[s] shall, to the maximum extent feasible, coincide with the route for the general public.") (emphasis added); 49 C.F.R. pt. 37, app. A 10.3.1(1), 10.3.2(2) ("[t]he circulation path, including an accessible entrance and an accessible route, for persons with disabilities shall, to the maximum extent practicable, coincide with the circulation path for the general public.") (emphasis added).

-30-

4.1.7(a) of which provides that:

> [a]lterations to a qualified historic building or facility shall comply with [ADA accessibility requirements including the routing requirement] unless it is determined in accordance with the procedures in 4.1.7(2) that compliance with the requirements for accessibility routes . . . would threaten or destroy the historic significance of the building or facility in which case the alternative requirements in 4.1.7(3) [providing for alternative "minimum requirements" for accessibility routes] may be used for the feature.

Plaintiffs contend that placing the elevators on the side steps of the Library would "threaten or destroy" the historic significance of the Boston Public Library. We need not in this case delineate the precise scope of the required "threaten or destroy" finding. It is sufficient for present purposes to conclude that a project that will not have an "adverse effect" under sections 106 and 110 cannot "threaten or destroy" the historic significance of the project for purposes of section 504 of the ADA. This is a situation in which the historic preservation statutes have spoken "more specifically to the topic at hand" than the ADA. Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 121 (2000). There is no suggestion here, and it is indeed inconceivable, that the ADA was designed to be more protective of historical properties than the primary historical preservationist statutes themselves (sections 106 and 110).

### 2. Section 4(f)(2)

We also reject plaintiffs' contention that the FTA violated the requirement of section 4(f)(2) that it undertake "all

-31-

possible planning to minimize harm to the . . . historic site . . . ."

Although the language of 4(f) does not define the set of alternatives that must be considered when performing a 4(f)(2) balancing, we agree with our sister circuits that have held that an agency need only consider alternatives that are feasible and prudent.[14] Here, as we have already discussed, plaintiffs have failed to establish that the agency failed to consider a prudent alternative to placing the inbound elevator on the Library steps (i.e. an alternative that would achieve ADA compliance).[15]

---

[14] Concerned Citizens Alliance, Inc. v. Slater, 176 F.3d 686, 702 (3d Cir. 1999) (holding that a "'feasible and prudent' determination [should be applied] to the world of alternatives that must be considered under 4(f)(2)," and that "the Secretary must consider every 'feasible and prudent alternative' that uses historically significant land when deciding which alternative will minimize harm, but that the Secretary has slightly greater leeway–compared to a 4(f)(1) inquiry–in using its expertise as a federal agency to decide what the world of feasible and prudent alternatives should be under 4(f)(2)"); Hickory Neighborhood Defense League v. Skinner, 893 F.2d 58, 62 (4th Cir. 1990) (acknowledging that 4(f)(2) contains an implied "feasible and prudent" test); Druid Hills, 772 F.2d at 716 (same); Louisiana Envtl. Soc'y, Inc. v. Coleman, 537 F.2d 79, 86 (5th Cir. 1976) (same); see also City of Bridgeton v. FAA, 212 F.3d 448, 462 (8th Cir. 2000) ("In reviewing an agency's choice among feasible and prudent alternatives [in its 4(f)(2) analysis], we again apply the arbitrary and capricious standard of review.").

[15] Plaintiffs also argue that the FTA should have considered the MBTA's implementation of Charlie Fare cards, which resulted in the elimination of automatic fare booths and, plaintiffs claim, could have allowed the elevator to deliver passengers directly onto the platform if option F had been implemented. We see no error in the FTA's failure to reopen proceedings to consider an alternative first suggested months after the review process was completed.

B.  The Outbound Elevator

We also reject plaintiffs' argument that placement of the outbound elevator on the Church sidewalk triggers section 4(f). Section 4(f) is not triggered unless a project "uses" a historical site.  Here, the parties appear to agree that the outbound elevator does not directly use a historic site.  Plaintiffs nonetheless contend that placing the outbound elevator on the Church sidewalk constitutes a "constructive" use of an historic site.

Under the regulations, a "constructive" use occurs if the impact of locating the project near the site is "so severe that the protected activities, features, or attributes that qualify [it] for protection under 4(f) are substantially impaired."  23 C.F.R. § 771.135(p)(2).  The regulations are ambiguous as to what constitutes a constructive use.  However, the regulations provide that a constructive use does not occur when there is a finding of 'no effect' or 'no adverse effect' under section 106.  23 C.F.R § 771.135(p)(5)(i). Here, the FTA's 'no adverse effect' finding related to the project as a whole, including the outbound elevator. In light of our conclusion that the "no adverse effect" finding was proper, the FTA's finding that placement of the elevator on the Church sidewalk did not constitute a "use" of a historic site was not erroneous.

IV.  Compliance with State Law

Finally, plaintiffs urge that the MBTA, in planning the

-33-

Copley Station Project, violated Section 5(k) of Massachusetts General Law Chapter 161A. Subsection 5(k) directs the MBTA to issue regulations "necessary and appropriate to provide the following parties the timely opportunity to participate in the development of major transportation projects . . . as defined by the directors . . . ." Mass. Gen. Laws c. 161A, § 5(k). The relevant parties include "state, regional and local agencies and authorities affected by said projects . . . [and] other public and private organizations, groups and persons who are affected by, and who have provided the board with reasonable notice of their desire to participate in the development of the design of [the] project." Id. Although regulations have not been issued under the statute, we assume that the statute itself requires timely opportunity to participate.

Although the MBTA urges that we decline to consider compliance with the Massachusetts statutes under Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984), we do not reach the immunity question. That question is not truly jurisdictional and thus need not be addressed before the merits of the state law claim. See Parella v. Retirement Bd. of Rhode Island Employees' Retirement System, 173 F.3d 46, 55 (1st Cir. 1999) (holding that immunity is not a true restriction on Article III jurisdiction and therefore need not be addressed before the merits).

Turning to the merits, we find no basis to conclude that the statutes were violated. The MBTA afforded public and private organizations the opportunity to comment and conducted several public meetings regarding the project. Furthermore, even assuming the plaintiffs had an individual right to participate and were "affected by" the project within the meaning of the statute, we agree with the district court that they were provided with sufficient opportunity to participate. The MBTA held a public meeting on July 21, 2003. Although the district court found that plaintiffs did not attend this meeting, the parties agree that they did. Plaintiff NABB also met with the MBTA twice more—once on August 5, 2003, when the design plans were 75 percent complete, and once on March 3, 2004, prior to final federal approval.

The plaintiffs contend that the plan was essentially complete when they met with MBTA on August 5, 2003. The plan had by then reached the "75 percent" stage. But the record makes clear that the MBTA was still soliciting comments from the public at this stage, and final federal approval had not yet occurred. The July and August 5, 2003, meetings satisfy the statute's requirement that the participation occur early enough to "permit comments to be considered prior to the final development of or commitment to any specific design for the project." Mass. Gen. Laws c. 161A, § 5(k). We conclude that plaintiffs have failed to establish a violation of the Massachusetts statute. Similarly, we find no merit to

-35-

plaintiffs' contention that the federal regulations required earlier consultation with affected parties. <u>See</u> 36 C.F.R. § 800.1(a).

CONCLUSION

Having determined that neither the FTA and MBTA acted unlawfully, we conclude that the district court properly denied preliminary and final injunctive relief. For the foregoing reasons, we therefore affirm the district court's judgment.[16]

<u>Affirmed</u>.

---

[16] Plaintiffs' Motion for Injunction Pending Appeal is denied. FTA's Motion to Modify the Record, MBTA's Motion to Supplement the Record, and related motions are denied.