**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PRESIDIO HISTORICAL ASSOCIATION; SIERRA CLUB,

*Plaintiffs-Appellants*,

v.

PRESIDIO TRUST, a federal government corporation,

*Defendant-Appellee*.

No. 13-16554

D.C. No. 3:12-cv-00522-LB

OPINION

Appeal from the United States District Court for the Northern District of California Laurel D. Beeler, Magistrate Judge, Presiding

Argued and Submitted October 20, 2015—San Francisco, California

Filed January 27, 2016

Before: Sidney R. Thomas, Chief Judge and Stephen Reinhardt and M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Presidio Trust Act / National Historic Preservation Act

The panel affirmed the district court's summary judgment in favor of the Presidio Trust in an action challenging the Trust's 2010 update for the Presidio Trust Management Plan for the area of the Presidio of San Francisco managed by the Trust, including the proposed 70,000 square feet of new lodge construction on the Main Post area.

The panel held that the Trust's 2010 management plan for the lodge complied with the Presidio Trust Act and the National Historic Preservation Act. Specifically, the panel held that construction of a new lodge offset by demolition of other buildings in the Main Post of the Presidio constituted "replacement of existing structures of similar size in existing areas of development" under the Presidio Trust Act. The panel also held that in settling on the lodge location and design, the Trust complied with Section 110(f) of the National Historic Preservation Act, which required the Trust "to the maximum extent possible . . . undertake such planning and actions as may be necessary to minimize harm to the landmark." The panel did not consider the Trust's proposed replacement construction other than the lodge.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Deborah A. Sivas, Alicia E. Thesing, Jacqueline M. Iwata, Joshua W. Malone, Raza Rasheed, Abigail Perri Barnes (argued), Mills Legal Clinic, Stanford, California, for Plaintiffs-Appellants.

Sam Hirsch, Acting Assistant Attorney General, Joseph T. Mathews, Robert J. Lundman, Katherine J. Barton (argued), Attorneys, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Andrea M. Andersen, Assistant General Counsel, Presidio Trust, San Francisco, California, for Defendant-Appellee.

Elizabeth S. Merritt, Washington, D.C., as and for Amicus Curiae National Trust for Historic Preservation.

Mark D. Perreault, Norfolk, Virginia, for Amicus Curiae Citizens for a Fort Monroe National Park, Inc.

**OPINION**

McKEOWN, Circuit Judge:

This appeal calls upon us to address the future development footprint of the historical heart of the Presidio of San Francisco ("Presidio")—a former military base that is now a National Park and a National Historic Landmark. Like the city in which it sits, the Presidio is caught in the middle of competing forces: on the one hand, a strong commitment to preservation, and on the other, the inexorable tide of change, development, and economic pressures.

The area of the Presidio at issue—the Main Post, sometimes referred to as the focal point of the Presidio—is managed by the Presidio Trust (the "Trust"), a wholly-owned government corporation created by the Presidio Trust Act. Omnibus Parks and Public Lands Management Act of 1996, Pub. L. No. 104-333, 110 Stat. 4097 (codified at 16 U.S.C. § 460bb app.) (" Presidio Trust Act" or "PTA"). The Trust is governed by both the Presidio Trust Act and the National Historic Preservation Act ("NHPA"). 54 U.S.C.A. § 300101 *et seq.* (West 2015).[1]

Under the Presidio Trust Act, the Trust must fulfill the dual statutory purposes of preserving the historic and natural character of the Presidio and making the Presidio financially self-sustaining. PTA §§ 101(5), (6), (7). To meet those directives, the Trust in 2002 adopted the Presidio Trust Management Plan (the "Plan"). The Trust amended the Plan for the Main Post district in 2011 (the "Update"). Among other things, the Update provided for extensive demolition and new construction on the Presidio's Main Post, including a new lodge, an expansion of the Presidio Theatre, an addition to the Presidio Chapel, and an archaeology lab.

This appeal is limited to the Update's proposed new lodge adjacent to the Presidio's Main Parade Ground. Labeling it as a "lodge" is something of a misnomer, because it is not a single, unitary structure. Instead, the design envisions twelve buildings totaling 70,000 square feet at a "maximum height of 30 feet above existing grade," with each building connected by "open-air porches" and styled after the historic, Civil War-era Graham Street barracks that once stood in

---

[1] Unless otherwise noted, all citations to 54 U.S.C.A are drawn from West's annotated 2015 edition of the United States Code.

roughly the same location.  For simplicity, we refer to this proposed development as "the lodge."  While the Trust envisioned the lodge as opening the park to more cultural, educational, and public uses and contributing to financial sustainability, critics allege the project contributes to commercialization of the park and undermines the Main Post's historic character.

Central to the appeal is whether the construction of a new lodge (70,000 square feet), offset by demolition of other buildings (94,000 square feet) in the Main Post, constitutes "replacement of existing structures of similar size in existing areas of development" under the Presidio Trust Act.  PTA § 104(c)(3).  We also address whether, in settling on the lodge location and design, the Trust complied with Section 110(f) of the NHPA, which requires that the Trust "to the maximum extent possible . . . undertake such planning and actions as may be necessary to minimize harm to the landmark."  54 U.S.C.A. § 306107.  Because the Trust complied with its obligations under both statutes, we affirm the district court's grant of summary judgment in favor of the Trust.

## BACKGROUND

The Presidio has been described as the birthplace of San Francisco and is noted for its diverse architectural styles and formal landscapes that illustrate the complex layering of construction over time.  In the mid-twentieth century, the Presidio began a transition from a fully-functioning military base to the recreational preserve that it is today, starting with its designation as a National Historic Landmark District in 1962.  In 1994, the National Park Service ("Park Service") assumed control of the Presidio from the Army and managed

the property under the Golden Gate National Recreation Area Act ("Golden Gate Act"), 16 U.S.C. § 460bb *et seq*. The Golden Gate Act sought to "preserve for public use and enjoyment certain areas of Marin and San Francisco Counties, California, possessing outstanding natural, historic, scenic, and recreational values, and . . . to provide for the maintenance of needed recreational open space necessary to urban environment and planning." *Id.* § 460bb. The Act limited new construction within covered lands to "reconstruc[tion]," and specifically provided that "[a]ny . . . structure which is demolished may be replaced with an improvement of similar size . . . ." *Id.* § 460bb-2(i).

Not long after, Congress revisited the Park Service's responsibility for the entirety of the Presidio, in part out of a desire to reduce the government's financial responsibility for maintaining the park. The result was the 1996 Presidio Trust Act, which divided the Presidio into two areas (Area A and Area B) and gave the newly formed Presidio Trust the authority to oversee, manage, and develop Area B of the park, roughly eighty percent of the area. PTA § 104(a).[2]

Specifically, the Trust is required to manage Area B in accordance with the Golden Gate Act and the Park Service's "General Management Plan" for the Presidio, both of which require protecting the historic character and predominantly natural setting of the Presidio. *Id.* At the same time, the Trust Act imposed a duty to develop a management plan "designed to reduce expenditures . . . and increase revenues to the Federal Government to the maximum extent possible." *Id.* § 104(c). To incentivize the Trust to fulfill this latter goal,

---

[2] The Park Service retained the remaining twenty percent of the park, denominated Area A, which runs along the coastline.

the Trust Act called for a fifteen-year phase-out of budgetary support, leaving the Trust responsible for making the Presidio financially self-sustainable.  *Id.* § 105(b).  As of 2013, the Presidio had achieved financial self-sustainability and no longer required subsidies from the federal government.

In 2002, the Trust adopted a Plan to fulfill the directives of the Trust Act.  For management purposes the Plan created seven planning districts.  These districts adapted the earlier planning districts established by the Park Service, and were "based on each area's historic uses; jurisdictional boundaries; human-made features such as roads, fences, and walls; and natural features and demarcations, including topography and vegetation."   Each district had a designated "planning concept" that would guide "future planning and building use decisions."  Like any part of the Trust's Plan, these planning districts and their applicable planning concepts may be altered at a later date.  Amendments to the Plan, however, are subject to statutory and administrative limitations and may require, for example, administrative review, public comment, or consultation with government agencies. PTA §§ 103(c)(6), 104(c).

The Main Post district, number 1, was designated as "Mixed-Use/Visitor & Community Focus,"[3] with a vision that it would be "the heart of the Presidio" and a "focal point for visitor orientation."  The Plan capped total building area in the Main Post district at 1,240,000 square feet.  It also capped lodging space in the park at 51,000 square feet.

---

[3] The two adjacent planning districts—the Crissy Field district, number 2, and the Letterman district, number 3—were designated as "Mixed-Use/Visitor & Cultural Focus" and "Mixed-Use/Office & Residential," respectively.

This map outlines Areas A and B (including the seven
planning districts):



Frustrated with the persistent "empty and uninviting" feel of the Main Post and its failure to achieve anticipated public visitation, the Trust began to consider a revision to the Plan as early as 2005.  Because the Trust was interested in larger lodging options than anticipated in the original Plan, the Update required a formal amendment process, including an environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and a formal consultation under Section 106 of the NHPA.

After several years and multiple iterations of environmental review, consultation, and public comment, the Trust released its Update in 2010.  The following year, the Trust documented its decision-making process in a Record of Decision, and formally adopted the Update on February 23, 2011.

The centerpiece of the Update—and the only component challenged in this appeal—is the lodge proposal.  The proposal ultimately reflected a scaled-back approach that the Trust adopted after consultation with interested parties, including the Park Service, the California State Historic Preservation Officer, and the Advisory Council on Historic Preservation.

The twelve small buildings of the lodge, which are aesthetically modeled after the historic Graham Street barracks, would be located on and adjacent to the footprint of Building 34 (a 31,824-square-foot, modern, non-historical building on the Main Parade that is slated for demolition under the Update).  This parcel is adjacent to the Main Parade Ground, which the Trust converted from a parking lot to grassy, open space years ago.  This setup is depicted in the following schematic:

AR035486



FIGURE 6: MAIN POST NEW CONSTRUCTION AND DEMOLITION

**Legend**
- Planned New Construction
- Planned Demolition
- Main Post District
- Building Treatment Subject to further consultation

**Planned Demolitions (D)**

| | |
|---|---|
| Building 34 | 31,824 SF |
| Building 40* | 8,216 SF |
| Building 41* | 8,298 SF |
| Building 46 | 50 SF |
| Building 98 | 449 SF |
| Building 385 | 10,580 SF |
| **Total** | **59,417 SF** |

* Demolition, removal, or relocation subject to further consultation.

TABLE 2: MAIN POST BUILDING DEMOLITION (IN SQUARE FEET [SF])

**Buildings to be Demolished for Doyle Drive**

| | |
|---|---|
| Building 201 (Hall) | 6,164 SF |
| Building 204 | 12,193 SF |
| Building 230 | 10,060 SF |
| Building 231 | 3,842 SF |
| **Total** | **32,259 SF** |

**Buildings Demolished Since PTMP**

| | |
|---|---|
| Building 215 | 1,848 SF |
| Building 85 | 415 SF |
| **Total** | **2,263 SF** |

| | |
|---|---|
| **Total** | **94,000 SF** |

**Planned New Construction (NC)**

| | |
|---|---|
| Lodge/Cafe | 70,000 SF |
| Presidio Theatre | 18,000 SF |
| Presidio Chapel | 4,000 SF |
| Archaeology Lab | 500 SF |
| Incidental New Construction | 30,000 SF |
| **Total** | **122,500 SF** |

**New Construction Since PTMP**

| | |
|---|---|
| Int'l Center to End Violence | 3,000 SF |
| Disney Family Museum | 18,000 SF |
| Transit Center | 2,000 SF |
| Buildings 86/87 Infill | 1,000 SF |
| **Total** | **24,000 SF** |

| | |
|---|---|
| **Total** | **146,500 SF** |

TABLE 3: MAIN POST NEW CONSTRUCTION (IN SQUARE FEET [SF])

According to the Trust, this mitigated design concept would greatly increase the public amenities in the Main Post area while also "strengthen[ing] the articulation of historic open spaces." Compared with the Trust's plans for the lodge before the proposal went through NEPA and NHPA consultation, the modified lodge design also does more to ensure that the "scale, massing, height, and design" are "compatible with the surrounding historic environment."

The lodge proposal was part of a more extensive plan within the Update, which contemplated approximately 146,500 square feet of construction: 24,000 square feet of already completed construction plus 122,500 square feet of new construction. The new construction included the 70,000 square feet for the lodge buildings, as well as additions to the Presidio Theatre, additions to the Presidio Chapel, an archaeology lab, and incidental new construction.

In its final form, the Update slated approximately 148,010 square feet of buildings for demolition. Of those, 94,000 square feet are in the Main Post planning district.[4] As part of the Doyle Drive Project, the Trust also included another 54,071 square feet of demolition from the nearby Crissy Field planning district (Buildings 605 and 606) and Letterman planning district (Building 1158) in its demolition calculations. This project will be a "partially tunneled and covered parkway that reestablishes a connection between Crissy Field and the Main Post."

---

[4] This number includes 59,417 square feet of new demolition plans; 32,259 square feet of new demolition (Buildings 204, 231, and 230) attributable to a related project renovating Doyle Drive; and 2,263 square feet of already completed demolition.

The proposed construction and demolition projects in the Update netted out to a negative 1,510 square feet.  The mathematical maneuver of totaling square footage from the Main Post planning district plus the nearby Crissy Field and Letterman planning districts meant that the Trust could say that the Update as a whole led to a net square footage decrease.  Thus, according to the Trust, it met its statutory obligation because the new buildings would replace existing buildings of similar square footage.

The Trust rooted its approach in what is termed the "banking" interpretation of Section 104(c)(3), under which the Trust could undertake new construction ("replacement") so long as the square footage ("similar size") of the new construction was offset by aggregate demolition from any developed part of Area B ("existing areas of development"). The Trust explicitly relied on the banking interpretation in adopting both the Plan and the Update, and it has been the Trust's operative theory of new construction authority until the current litigation.

After the Trust finalized the Update, the Presidio Historical Association and the Sierra Club (the "Associations") filed suit, challenging the Update on the grounds that the new lodge violated applicable statutes.

On cross-motions for summary judgment, the district court granted summary judgment to the Trust.  The district court specifically disclaimed any reliance on the Trust's banking interpretation of Section 104(c)(3) of the Presidio Trust Act: "In reaching a conclusion that the Trust acted within its statutory authority, the court need not decide (and does not hold) that the Trust can 'bank' square footage from any area of development or one planning district and use it as

it chooses in another area or district." Instead, the district court found Section 104(c)(3) ambiguous and held that the lodge proposal was well within any reasonable interpretation permitted by the statute.

The district court also held that, whether Section 110(f) of the NHPA imposes procedural or substantive obligations on agencies, it could not "see what else the Trust could have done besides not build the hotel at all." Finally, the district court concluded that the Trust complied with NEPA and was not required to re-circulate its Final Supplemental Environmental Impact Statement for public comment after making relatively modest changes to the lodge proposal.

On appeal, the Associations raise claims only under the Presidio Trust Act and the NHPA—not NEPA—and have framed the questions on appeal as limited to the lodge construction.[5] The district court had jurisdiction to review the Update as a final agency action under 28 U.S.C. § 1331 and 5 U.S.C. § 706(2), and we have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's decision on the motion for summary judgment. *Turtle Island Restoration Network v. NMFS*, 340 F.3d 969, 973 (9th Cir. 2003).

---

[5] The key issue on appeal is posed as follows: "Does the Presidio Trust's 2010 management plan violate Section 104(c)(3) of the Presidio Trust Act . . . by authorizing approximately 70,000 square feet of new construction on existing open space in the Main Post?" The second issue under the NHPA is likewise framed around the legality of the "plan to construct a new commercial hotel on the Main Post."

**ANALYSIS**

## I.  THE PRESIDIO TRUST ACT

At the center of the dispute over the lodge proposal is interpretation of Section 104(c) of the Presidio Trust Act. This section requires the Trust to "develop a comprehensive program for management of those lands and facilities within the Presidio which are transferred to the administrative jurisdiction of the Trust. . . . Such program shall consist of—

> (1) demolition of structures which in the opinion of the Trust, cannot be cost-effectively rehabilitated, and which are identified in the management plan for demolition,
>
> . . .
>
> (3) new construction limited to replacement of existing structures of similar size in existing areas of development . . ."

PTA § 104(c).

The Trust reads Section 104(c)(3) to permit new construction in any existing area of development so long as the new construction is offset by demolition in any existing area of development throughout the park—*i.e.*, the banking interpretation. In the course of litigation, the Trust also advanced a narrower interpretation of the statute that would permit new construction so long as it is offset by demolition in the same existing area of development—*i.e.*, what the Associations term the "banking lite" interpretation. The

Associations take the position that Section 104(c)(3) limits new construction to replacement of demolished structures with "buildings of roughly the same size in roughly the same place"—essentially a building-by-building, or one-up, one-down, approach.

We reject the Trust's broader banking theory, but agree that the statute supports a variant of its narrower interpretation. The buildings scheduled for demolition within the same Main Post planning district (94,000 square feet) offset the lodge's 70,000 square feet of new construction within close proximity to the demolished structures. We therefore hold that the lodge proposal qualifies as a "replacement of existing structures of similar size in [an] existing area[] of development." PTA § 104(c)(3). Because the lodge is the only new construction at issue in this appeal, we need not concern ourselves with the calculations related to the remaining demolition and new construction contained within the Update. Nor do we explore the outer limits of what is permissible under the statute.

Our reasoning rests on the familiar *Chevron* analysis because the Trust is a government entity with statutory authority to make binding policy regarding Area B of the Presidio. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 648 (9th Cir. 2004) (treating the precedential value of an agency's statutory authority as determinative of whether *Chevron* applies). Under *Chevron*, we look first to the text of the statute to determine whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed

intent of Congress." *Id.* at 842–43. If the intent of Congress is not clear, then we consider whether the Trust's interpretation is "based on a permissible construction of the statute." *Id.* at 843.

In reaching their preferred, albeit divergent, readings of "replacement of existing structures of similar size," both sides start with the proposition that the statute is unambiguous. Yet the seemingly simple statute raises more questions than it answers and we conclude that it is ambiguous with respect to the scope of the Trust's authority to undertake new construction. A dizzying array of square footage figures offered by the parties hints at deep underlying ambiguity, and nothing in the plain text of the statute—the common denominator for the purposes of our analysis—adds any clarity. *See United States v. Ermoian*, 752 F.3d 1165, 1168 (9th Cir. 2013) ("We begin, as any effort to interpret a statute must, with the text.").

We first consider the Associations' position that the statute unambiguously mandates a rough one-up, one-down principle. This argument fails on a plain language reading of the statute.

The Associations largely assume that the word *size* refers to square footage, but we note that size might also refer to a building's volume, height, footprint, scale, massing, or some combination of factors that are simply not delineated by the statute and thus inevitably require interpretation and judgment calls on the part of both the Trust and this court. Additionally, the term *similar*, particularly as part of the phrase "similar size," itself evokes a qualitative judgment, which is anathema to the notion of clarity at *Chevron* step one.

The purported plain meaning of the word *replacement* does not fare any better. To be sure, the contours of its accepted meaning limit the realm of possibilities, requiring that there be a plausible connection between the replacement and its predecessor. *See* Oxford English Dictionary (3d ed. 2009) (defining *replace* as "to provide a substitute for" or "put an equivalent in place of"). But whatever inherent limiting effect the word *replacement* might impart, the narrow meaning is lost when the word is read in context. The statute refers to replacement of "existing structures" rather than *an* "existing structure." PTA § 104(c)(3). Thus, this language does not preclude a building or groups of buildings from replacing other groups of buildings, making it increasingly difficult to be sure what must be compared for similarity, let alone how to compare it.

The ambiguity of this phrase stands out in contrast with the Golden Gate Act, which employed similar, but far clearer, language limiting new construction. *See* 16 U.S.C. § 460bb-2(i) (prohibiting new construction generally but allowing "[a]ny . . . structure which is demolished" to be "replaced with *an* improvement of similar size" (emphasis added)). Had Congress intended the Trust Act to maintain the same strictures that governed new construction in the Presidio under the Golden Gate Act, it presumably would have kept the singular form, which better supports a one-up, one-down principle. *Schwenk v. Hartford*, 204 F.3d 1187, 1201 n.12 (9th Cir. 2000) ("Where limiting language present in earlier statutes is not included in later legislation, it can be presumed that the omission was intentional.").

The Associations acknowledge that the phrase "replacement of existing structures of similar size" does not bind the Trust to put new construction in exactly the same

place and make it exactly the same in appearance or even footprint as the prior structures.  They assert only that the Trust must put new construction "roughly" in the same location as the demolished building and make it "roughly" the same size.  The Associations further acknowledge that it might be possible under their interpretation to remove several buildings and replace them with one new building of similar aggregate size.  This common-sense concession certainly embraces one plausible reading of the statute, but one can posit both narrower and more expansive definitions of the provision's operative terms, which are inherently abstract and imprecise.  The specificity that *Chevron* step one demands is simply lacking here.

The statute also states that the new construction may only replace existing structures in "existing *areas* of development."  PTA § 104(c)(3) (emphasis added).  The reference to "existing areas" would be rendered superfluous if the provision required the Trust to proceed on a building-by-building basis, since the building being replaced would necessarily have been in an existing area of development. *See Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1177–78 (2013) (noting that a statutory interpretation that renders other statutory language superfluous is generally disfavored, particularly if there is another interpretation that gives effect to every clause and word of a statute).  Reading the phrase "replacement of existing structures of similar size" in light of the phrase "existing areas of development" compounds the ambiguity of PTA § 104(c)(3).  In sum, we are unconvinced by the Associations' reading of the statute.

Nor are we persuaded that the Trust's banking interpretation passes the test at *Chevron* step one.  The claim that the statute unambiguously mandates this interpretation is

in considerable tension with the plain text of the statute. Put literally, the Trust's reading would have the statute say that the Trust can undertake new construction to "replicate square footage (in the aggregate) from buildings demolished in any area of the park where there is development." This expansive formulation essentially reads out plausible, common-sense meanings of the words *replacement* and *similar size.*

At *Chevron* step one, we determine whether Congress has spoken to the "precise question at issue." *Chevron*, 467 U.S. at 842. The answer here is no. The statute is unclear. Notably, neither side presents a compelling argument for any definitive, unambiguous definition of what is required of the Trust. In the end, the most that can be said of the statute is that it grants some unspecified discretion to the Trust to undertake new construction projects within certain obscure strictures.

In the face of an ambiguous statute, under the second step of the *Chevron* analysis, we defer to the Trust's interpretation so long as it is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. We hold that the Trust's expansive banking interpretation is impermissible because it is "manifestly contrary to the statute." *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239 (2004) (citation omitted).

While the new construction authority granted by the Presidio Trust Act is indeed capacious, there are nevertheless limits to what the Trust can read into the Act's delegation of authority. *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2442–43 (2014) ("Even under *Chevron*'s deferential framework, agencies must operate 'within the bounds of reasonable interpretation.'" (quoting *City of Arlington v.*

*F.C.C.*, 133 S. Ct. 1863, 1868 (2013)).  The key infirmity of the banking interpretation is that it imposes no discernible limits on the Trust's development authority across the Presidio, and thus would lead to an "enormous and transformative expansion" of the Trust's "regulatory authority without clear congressional authorization." *Id.* at 2444.  For example, nothing in the banking approach would prevent the Trust from demolishing all of the buildings in the Main Post district in order to offset the construction of a high-rise condominium complex across the Presidio in the heart of the relatively undeveloped South Hills area.[6]  Although the Trust points to the requirement that the new construction be in "existing areas of development" to disclaim any power to use the banking approach to undertake such a project, the "existing areas of development" language has no limiting effect where it is statutorily undefined and virtually every area of the Presidio (and certainly every planning district) contains at least some development.  Even if the banking theory contained discernible limits, efforts to balance the "ledger" over time and space, while the Trust juggles multiple development projects over multiple years, would be a nightmare in practice.  Taken at face value, the Trust's theory would render the entire Area B of the Presidio subject to unspecified development under the Trust Act, so long as square footage from somewhere (or multiple somewheres) was replaced with square footage anywhere else in the Presidio.

---

[6] The Trust argues that in all likelihood it would be prevented from undertaking such construction by other applicable statutes, such as NEPA, the NHPA, and the Golden Gate Act.  Yet we are required to construe the Trust Act on its own terms, not in reference to or as part of a constellation of other independent statutory obligations.

That the banking interpretation would permit unlimited authority puts it at odds with a major purpose of the Trust Act—*i.e.*, to implement "sound principles of land use planning" and "protect[] the Presidio from development and uses which would destroy the scenic beauty and historic and natural character of the area and cultural and recreational resources[.]"   PTA § 101(5).   That is reason enough to conclude that the banking interpretation is impermissible. *See Chem. Mfrs. Ass'n v. E.P.A.*, 217 F.3d 861, 867 (D.C. Cir. 2000) (holding EPA's interpretation of an ambiguous statutory provision unreasonable where it was inconsistent with the Clean Air Act's purpose).

Ultimately, any reasoned interpretation of the statute must account for the diversity of the Presidio's landscape, the vastly different levels of development in different areas of the park, and the historic nature of the park.  For instance, the South Hills planning district is a largely undeveloped natural area, albeit with some small buildings, while the Main Post and Letterman planning districts are relatively urban.  The Trust adopted the planning districts in recognition of the reality that these districts had different "historical uses" and features.  If nothing else, Section 104(c)(3) was designed to prohibit the wholesale re-purposing of remote corners of the Presidio that currently feature vastly different characteristics and disparate levels of development.  Yet the banking interpretation permits just that—the Trust offers no effective limiting interpretation that would account for the Trust's duty to preserve the existing architectural and natural diversity of the Presidio.  The Trust's banking interpretation cannot pass muster because it "entirely fail[s] to consider an important aspect of the problem" at hand.  *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015) (quoting *Motor Vehicle Mfrs. Ass'n of*

*United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In the face of its unsuccessful efforts to persuade the district court to embrace a broad reading of the statute, on appeal, the Trust advanced a new, narrower interpretation of Section 104(c)(3).  The Trust asks us to read the statute to permit construction of new buildings where their aggregate square footage is offset by demolition within the same existing area of development.  We understand the Trust's alternative theory as asserting authority to offset new construction with demolition in some physical proximity of the new construction, regardless of the boundaries of the planning districts.  Under this "banking lite" theory, the Trust argues that the lodge proposal—and, indeed, the Update's new construction plans as a whole—are "more than offset[]" by the demolition in the immediately adjacent areas of development, including the demolition in the Main Post Update plus demolition of the nearby Buildings 605, 606, and 1158 in the Crissy Field and Letterman planning districts. The Trust views the three buildings outside the Main Post planning district as "still within the larger 'existing area of development' that includes the Main Post."

The Record of Decision, which adopted the Update, is predicated on the Trust's banking interpretation.  In contrast, the new "banking lite" theory—advanced for the first time on appeal in response to the district court's rejection of the Trust's effort to invoke *Chevron*—is nothing more than a convenient litigating position.  "Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (citation omitted).   The "banking lite"

interpretation is not the product of any considered development, nor has the Trust's theory been consistent throughout the administrative process. Because of the way it came about and its potentially broad reach, we decline to give the litigating position any special deference under *Skidmore*. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("The weight of [an agency interpretation] will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking power to control.").[7]

The ultimate question is whether the lodge proposal falls within the statutory mandate that new construction projects are limited to "replacement of existing structures of similar size in existing areas of development . . . ." PTA § 104(c)(3). *See also* 5 U.S.C. § 706(2). We conclude that it does. The new lodge construction is projected for 70,000 square feet, while the physically proximate planned demolition within the Main Post planning district alone amounts to over 90,000 square feet.[8]

---

[7] Our approach to *Skidmore* deference vis-a-vis an agency's litigating position has varied depending on the factual circumstances. *Compare Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008) (affording no deference to the government's litigating position) *with Andersen v. DHL Ret. Pension Plan*, 766 F.3d 1205, 1212 (9th Cir. 2014) (affording *Skidmore* deference to the government's litigating position); *Price v. Stevedoring Serv. of Am., Inc.*, 697 F.3d 820, 829–32 (9th Cir. 2012) (en banc) (affording *Skidmore* deference to the government's litigating position).

[8] The Trust left open the question of whether it will follow through in demolishing Buildings 40 and 41, which are located in the Main Post planning district and were counted in its 94,000 square feet demolition calculation. Even without these two buildings, which total 16,514 square

As already explained, the term "replacement" is not confined to a one-for-one demolition/new construction meaning. Instead, replacement can include, collectively, construction of more than one structure offset by demolition of more than one structure, thus giving meaning to the plural language of "existing *structures*." PTA § 104(c)(3) (emphasis added). Further, treating the "similar size" restriction as encompassing at least a comparison of the square footage of the relevant demolished buildings, without necessarily cabining its meaning to that unit of analysis, ties the statutory requirements together in a manner consistent with the statute's language and purpose. *Id.* Finally, the phrase "existing areas of development" should be limited to development in areas physically proximate to the location of the building being replaced.[9]  *Id.*   This interpretation harmonizes all of the elements of the statute. *See Boise Cascade Corp. v. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991) ("Under accepted canons of statutory interpretation, we must interpret statutes as a whole . . . .").

---

feet, the rest of the planned demolition in the Main Post planning district would still exceed the 70,000 square feet of new lodge construction.

[9] Unlike the more sweeping banking theory, this interpretation also imposes some foreseeable limits on the Trust's new construction authority that are more in keeping with the purposes of the Presidio Trust Act. The Trust could not, for instance, undertake isolated new construction in a remote corner of the park, because it would need to establish physical proximity to an existing area of development in which the purported "replacement" was located. This interpretation further reinforces the purposes of the Presidio Trust Act by allowing the Trust to draw new construction authority from physically proximate parcels that are already likely similar in character. It therefore prevents the Trust from fundamentally re-purposing certain areas of the part in one fell swoop, and generally preserves the architectural, historic and natural diversity of the Presidio as a whole.

We conclude that the Trust's Update with respect to the proposed lodge and the offsetting demolition in the Main Post area is consistent with Section 104(c)(3).  Without doubt, the proposed lodge is physically proximate to the other Main Post demolition sites.  Each of the buildings being "replace[d]" is within several hundred yards of the proposed lodge and falls within a similarly developed area of the Presidio.  It does not matter that there may be more structures than before: the new buildings still replace the other buildings within the Main Post planning district.  To be sure, there remains some leeway as to how far the statute extends, especially with respect to the requirement of physical proximity.  But we need not delineate the outer limits of that extension nor consider whether proximity is defined by the boundaries of the planning districts.  Although the Trust reached across district lines to justify proposed construction in addition to the lodge, that expanded construction effort is not before us.  Thus, we do not reach the question of whether Buildings 605, 606, and 1158 (encompassing 54,071 square feet), which are within two different, but adjacent, planning districts, legitimately could be counted to offset other planned construction in the Main Post.  All we decide here is that the lodge construction and demolition taking place within the Main Post satisfy the replacement, size, and proximity limitations of Section 104(c)(3).

## II.  THE NATIONAL HISTORIC PRESERVATION ACT

Because the Presidio is a National Historic Landmark District, any project that alters the Presidio's structures is subject to the provisions of the NHPA.    54 U.S.C.A. § 306101.  The NHPA imposes two sets of obligations on federal agencies, depending on the features of the historic site at issue.

To begin, Section 106 requires an agency undertaking a project expected to adversely affect a public or private site listed on the National Register of Historic Places to "take into account the effect of the undertaking on any historic property." 54 U.S.C.A. § 306108. Congress created the Advisory Council on Historic Preservation ("Advisory Council") to aid in the implementation of this task and to "recommend measures to coordinate activities of Federal, State, and local agencies and private institutions and individuals relating to historic preservation[.]" *Id.* § 304102(a)(1). The Advisory Council has promulgated extensive regulations governing Section 106 consultation. *See* 36 C.F.R. §§ 800 *et seq*. These regulations require the undertaking agency to consult with other parties regarding whether the project poses any identifiable adverse effects, *id.* § 800.5, and to "seek ways to avoid, minimize or mitigate the adverse effects," *id.* § 800.6(b)(1)(i).

A second requirement is that projects affecting government-owned sites and National Historic Landmarks, such as the Presidio, trigger the additional statutory requirements of Section 110, which was added to the statute in 1980. Pub. L. No. 96-515, 94 Stat. 2987 (1980) (codified as amended at 54 U.S.C.A. § 306101 *et seq.*). Section 110 sought to "clarif[y] and codif[y] the minimum responsibilities expected of federal agencies in carrying out the purposes of the [NHPA][.]" H.R. Rep. No. 96-1457, at 36 (1980). For instance, agencies must seek to use historic properties available to them before embarking on construction or acquisition, 54 U.S.C.A. § 306101(a)(2), and must develop a preservation program for federally-owned properties, *id.* § 306102. National Historic Landmarks are subject to the specific requirements of Section 110(f), which reads, in relevant part: "Prior to the approval of any Federal

undertaking that may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark." *Id.* § 306107.

In discharging its obligations under the NHPA, the Trust engaged in extensive Section 106 consultation with multiple parties, including state historical preservation officers, the Advisory Council, and the public. Ultimately, the Trust adopted recommendations made by the Park Service and interested entities to address and mitigate any adverse effects of the lodge. The Advisory Council and other consulting parties signed a memorandum of agreement confirming compliance with the required planning processes. *See* 36 C.F.R. § 800.6(c).

In light of the extensive compliance efforts under Section 106, the Associations, not surprisingly, do not challenge that aspect of the Trust's planning. However, they argue that the Trust failed to comply with the additional requirements of Section 110(f). According to the Associations, the Section 110(f) language relating to a) "minimiz[ing] harm to the landmark" and b) "to the maximum extent possible," imposes a heightened substantive standard against which the Trust's final decision must be judged.[10] We disagree.

---

[10] Section 110(f) goes on to say that the responsible agency "shall afford the [Advisory] Council a reasonable opportunity to comment with regard to the undertaking." 54 U.S.C.A. § 306107. The Associations do not assert that this portion of Section 110(f) is substantive, and the Advisory Council's affirmation in the memorandum of agreement that the Trust had afforded it an "opportunity to comment on the Undertaking" is in any event sufficient to satisfy this obligation.

Our court has consistently held that "the NHPA, like NEPA, is a procedural statute requiring government agencies to 'stop, look, and listen' before proceeding" when their action will affect national historical assets. *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 607, 610 (9th Cir. 2010) (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999)); *see also Lee v. Thornburgh*, 877 F.2d 1053, 1056 (D.C. Cir. 1989) ("Our review of the statutory text [of the NHPA] persuades us that Congress intended these provisions to have a limited reach; they are aimed solely at discouraging federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control."). Although these cases do not reference Section 110(f) specifically, they do post-date adoption of the section.

Section 110(f) cannot be read in a vacuum. It builds on the general consultation process set out in Section 106, which the Associations acknowledge is a procedural "stop, look, and listen" requirement, but sets out a heightened procedural standard for National Historic Landmarks, calling for "planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C.A. § 306107. The obligation referred to is the requirement to "undertake such planning and actions," and to do so to the "maximum extent possible." *Id.*

Congress often requires agencies to consider a variety of alternatives on the theory that such consideration makes it more likely substantive results will follow. *See* Joseph L. Sax, *The (Unhappy) Truth About NEPA*, 26 Okla. L. Rev. 239, 240 (1973) ("NEPA's obvious, if unstated, assumption was that by requiring the agencies to explore, consider, and publicly describe the adverse environmental effects of their programs, those programs would undergo revision in favor of

less environmentally damaging activities."). Thus, Congress may mix substantive language with purely procedural constraints. Such is the case here: the directive "minimizing harm to the landmark" to the "maximum extent possible" reflects what Congress apparently hoped would result from heightened analysis.

The only other circuit to confront the issue is in accord that Section 110(f) is not a substantive mandate. In addressing Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c), the First Circuit held that "Section 4(f), unlike sections 106 and 110(f) [of the NHPA], imposes a substantive mandate." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit. Admin.*, 463 F.3d 50, 64 (1st Cir. 2006).[11]

The legislative history confirms that Congress intended to impose only a "higher standard for agency *planning* in relationship to landmarks *before* the agency brings the matter to the council." H.R. Rep. No. 96-1457, at 38 (1980) (emphasis added). Indeed, the legislative committee noted that, "[a]lthough [it] deleted a mandatory requirement that an agency first determine that 'no prudent and feasible alternative to such undertaking exists,' [it] [did] intend for agencies to *consider* prudent and feasible alternatives." *Id.* (emphasis added). As with NEPA, it would be difficult to interpret this history as suggesting anything other than an

_____

[11] The Fifth Circuit has also held generally that NHPA is a procedural statute. *See Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 225 (5th Cir. 2006). Although it went on to note that Section 110(f) "imposes an affirmative duty on federal agencies to minimize harm to National Historic Landmarks where it finds that a project will adversely affect such landmarks," the court did not reach that specific question because there was no adverse effect. *Id.* at 243–44.

intent to require agencies to canvass their options with a keen eye.

We are not persuaded by the argument of amicus curiae National Trust for Historic Preservation that Congress clearly intended to model Section 110(f) on another statute that the courts have interpreted as substantive—Section 4(f) of the Department of Transportation Act.  49 U.S.C. § 303(c). Notably, Section 4(f), while including nearly identical language about minimizing harm, also includes a very important qualifier not present in the NHPA, namely that historic sites may be approved "*only* if . . . there is no prudent and feasible alternative to using that land[.]"  49 U.S.C. § 303(c) (emphasis added).  The First Circuit recognized this critical difference in declaring Section 4(f) to be a substantive mandate, in contrast to Section 110(f). *Neighborhood Ass'n*, 463 F.3d at 64.  If anything, Congress's decision to strip the mandatory language about exhausting prudent and feasible alternatives from the bill that eventually became Section 110(f), *see* H.R. Rep. 96-1457, at 38, is evidence of Congress's intent to distinguish Section 110(f) from Section 4(f) of the transportation legislation.  *Schwenk*, 204 F.3d at 1201 n.12.

Although court decisions interpreting other, similar statutes can be persuasive, our best guide to what *this* statute means is the text.  The legislative history of Section 110(f) is icing on the cake.  *See City & Cnty. of S.F. v. U.S. Dep't of Transp.*, 796 F.3d 993, 998 (9th Cir. 2015) (noting that the first source to examine is the "plain words of the statute" and the last is "similar provisions within the statute as a whole and the language of related or similar statutes" (citations omitted)); *Negusie v. Holder*, 555 U.S. 511, 519–20 (2009) (rejecting an analogy to a holding in a case interpreting

another, similar statute where the language and design of the statute in the case at hand were distinguishable).

In holding that Section 110(f) does not impose a substantive obligation, we do not mean that Congress failed to heighten the procedural hurdles an agency must satisfy with respect to projects affecting National Historic Landmarks. The Trust cannot rest on the fact that, by all indications, it complied with the letter of Section 106. Something more was required under Section 110(f). The best indication of what else was required can be found in the legislative history, which says that the agency should at least "consider prudent and feasible alternatives" to avoid adverse effects. H.R. Rep. No. 96-1457, at 38; *see also* 63 Fed. Reg. 20,495, 20,503 (Apr. 24, 1998). This obligation stands on top of the more general duty in the Section 106 consultation process to "seek ways to avoid, minimize or mitigate . . . adverse effects." 36 C.F.R. § 800.6(b). In short, the Trust was required to thoroughly consider—rather than simply identify and catalog—prudent and feasible alternatives to its proposed lodge design and in its planning process.

We are satisfied that the Trust met this heightened standard within the planning process. The original lodge proposal changed dramatically over time, from a behemoth building to a smaller, historically appropriate collection of buildings. In its 2009 response to the Trust's plans, the Park Service recommended that the Trust "[r]educe the footprint, scale, massing, and height of the proposed lodge; break up the mass into separate buildings . . . or remove the lodge from the Main Post." In response, the Trust broke the lodge into twelve separate buildings with spaces of ten to twenty feet between them to preserve visual continuity between the Old and Main Parade Grounds, reduced the total square footage

from its earlier proposals, and adopted at least a partially historically integrated design concept.

The Trust also gave consideration to possible lodging in the existing Montgomery Street Barracks buildings, but found that the project was not feasible at the time. As late as 2010, in the final stages of its deliberation, the Trust gave extensive consideration to at least three lodging alternatives in its Final Supplemental Environmental Impact Statement, none of which included any new lodge construction.[12] In the Trust's judgment, arrived at through extensive public engagement, these no-lodge alternatives were insufficient for the purposes of the Main Post Update. Altogether, the Trust's thorough consideration of lodging options in available existing properties was sufficient to satisfy its obligation to "use, to the maximum extent feasible, historic property available to the agency[.]" 54 U.S.C.A. § 306101(a)(2); *see also* 63 Fed. Reg. at 20,500 ("[An agency] has an affirmative responsibility to seek and use historic properties to the maximum extent feasible in carrying out its activities."). Nothing in the record suggests that the Trust "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d

---

[12] These included: 1) "Lodging in Pershing Hall (Building 42) and dormitory rooms for visitors in Buildings 40 and 41"; 2) "Lodging in Pershing Hall and B&Bs in upper Funston Avenue Officers' Quarters (Buildings 11-16)"; and 3) "Residences in Pershing Hall and dormitory rooms for visitors in Buildings 40 and 41."

1105, 1110 (9th Cir. 2015) (quoting *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009)).

The Park Service and the Trust disagreed about whether the goals of the Update could be accomplished without a new lodge. The Park Service concluded that a "new lodge at the Main Post is not the only means to 'welcome visitors and animate the Main Parade'" and that "there are other ways to achieve this goal, such as through rehabilitation of existing buildings at the Main Post, the establishment of a Visitor Center, and programs." Likewise, the Presidio Historical Association stated that its problems with the Update stemmed not from a lack of "hard work and creativity," but from problems "at the level of the concepts themselves." But under the terms of Section 110(f), the Trust was not obligated to agree with the Park Service's or the Presidio Historical Association's views—it had to give them full and reasoned consideration, which it did. Indeed, the Trust "incorporate[d] the majority of the recommendations outlined in the [Park Service's] report," and offered reasoned explanations where it deviated from the Park Service's preferred result. The Trust's procedural undertakings surely meet the heightened standard of care imposed by Section 110(f) to undertake "to the maximum extent possible . . . such planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C.A. § 306107.

## CONCLUSION

Because the Trust complied with the Presidio Trust Act and the NHPA, we affirm the district court's grant of summary judgment to the Trust with respect to the proposed 70,000 square feet of new lodge construction on the Main

Post of the Presidio.  We do not consider the Trust's proposed replacement construction other than the lodge.

**AFFIRMED.**